**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Dennis Hoffberg, | |
| *Plaintiff,* | |
| v. | No. 21 CV 5063 |
| Elliot Auto Supply Co., Inc., a Minnesota Corporation, d/b/a Factory Motor Parts, | Judge Lindsay C. Jenkins |
| *Defendant.* | |

**MEMORANDUM OPINION AND ORDER**

Dennis Hoffberg ("Hoffberg") brings this suit against his former employer Elliot Auto Supply Co., Inc., d/b/a Factory Motor Parts ("FMP") for discrimination and retaliation under the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"). [Dkt. 58.] Before the Court is FMP's motion for summary judgment. [Dkt. 90.] For the reasons stated below, the motion is granted in part and denied in part.

## I.   Background[1]

Hoffberg is a 73-year-old man with substantial experience in the automotive supply industry. [Dkts. 108, ¶1; 113, ¶1.] FMP is a supplier of automotive parts to

---

[1]     The Court presents the facts in the light most favorable to Hoffberg. *Emad v. Dodge Cty.*, 71 F.4th 649, 650 (7th Cir. 2023). The facts are taken from the parties' Local Rule 56.1 statements and accompanying exhibits, [Dkts. 108, 113], and are undisputed except where a dispute is noted. Regarding disputes, under Local Rule 56.1, "[t]o dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." Loc. R. 56.1(e)(3). In this case, at times, the party's responses did not "cite specific evidentiary material that controverts," an asserted fact, or the evidence a party cited to does not support the assertion that a fact is genuinely disputed, in which case, the Court deems those facts admitted. Loc. R. 56.1(e)(3). Thus, even where a party has attempted to dispute a statement of fact by citing

1

automotive service centers, dealerships, and fleets nationwide. [Dkt. 108, ¶2.] Hoffberg was employed by FMP twice—his first term of employment was from 2007 to 2013,[2] and his second term was from 2016 to 2020. [*Id.*, ¶¶1, 8–11.]

This lawsuit arises from Hoffberg's second term of employment with FMP, which began in April 2016, when FMP rehired Hoffberg as their Regional Sales Manager. [*Id.*, ¶¶11–13, 18.]. Hoffberg was then 65 years old. [*Id.*] During this time, Hoffberg worked in several sales positions at FMP's facility in McCook, Illinois, and he reported to Tom Cinnamon ("Cinnamon") from 2016 until the fall of 2019. [*Id.*, ¶¶1, 17.] Seven months into his second term of employment, in November 2016, Hoffberg was demoted to Sales Representative. [*Id.*, ¶19.] FMP asserts the demotion was due to performance concerns, [*Id.*, ¶20], but Hoffberg disputes this and maintains that Cinnamon told him that it was due to a decline in overall business in the region. [*Id.*, ¶¶19–20; Dkt. 91 at 68 (Tr. 39:1–6).]

In October 2017, FMP promoted Hoffberg, then age 67, to Regional Business Sales Development Manager. [Dkt. 108, ¶21.] In July 2018, Hoffberg received a written reprimand from Cinnamon (the "First Corrective Action"). [*Id.*, ¶22; Dkt. 91 at 268–70.] FMP asserts that Hoffberg received the First Corrective Action because he failed to properly manage AT&T—a key client relationship—despite being notified by Cinnamon about the importance of meeting AT&T's expectations. [Dkt. 108, ¶22.] Hoffberg disputes the accuracy of the First Corrective Action because he says he was

---

specific evidence, where that party has failed to create a genuine dispute, the fact is deemed admitted. *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012).

[2] During his first term at FMP, Hoffberg served as a Regional Sales Manager until he was terminated due to "a lack of work." [Dkt. 108, ¶¶8–9.]

on an approved vacation at the time. [*Id.*; Dkt. 91 at 84 (Tr. 101:6−102:16); *see id.* (Tr. 103:5−10).] FMP contends that because of this failure, Cinnamon "further demoted" Hoffberg. [Dkt. 108, ¶¶23, 24.] Hoffberg admits that his management functions were removed but asserts that this was not akin to a demotion. [*Id*; Dkt. 91 at 271−72.] Despite these issues, Cinnamon rated Hoffberg's performance as "meeting expectations" in 2016, 2017, and 2018. [Dkt. 113, ¶1.]

## A. Second Corrective Action and 2019 Annual Performance Review

Beginning in late 2019, after Cinnamon left FMP, Hoffberg began reporting to Glen Borgardt ("Borgardt"). [Dkt. 108, ¶17.] Borgardt, in turn, reported to Ronald Turner ("Turner"), Senior Director of FMP's Chicago Region. [*Id.*, ¶¶16−17, 25.]

Although it is undisputed that Borgardt supervised Hoffberg, the parties dispute whether Turner also supervised him. [Dkt. 113, ¶21.] Hoffberg asserts that he "took direction and supervision from" both, [*see* Dkts. 108, ¶17; 113, ¶2], pointing to Borgardt's deposition testimony, where he affirmed that Hoffberg took direction and supervision from him and Turner, and that he and Turner could affect the terms and conditions of Hoffberg's employment. [Dkt. 91 at 205−06 (Tr. 19:10−20:10).]

In an October 2019 email, Turner told Borgardt that he planned on "spending time in the field" with Hoffberg because "we have tons of opportunity and I really believe they could use the help." [Dkt. 106.] The email went on to say that Turner "would like to identify another sales person that could work this channel fulltime when [Hoffberg] decides to hang it up [because] training a replacement should start sooner than later." [*Id.*; Dkt. 113, ¶10.]

3

In 2019,[3] Turner assisted Hoffberg with several of his accounts, which included attending account meetings and interacting with client representatives. [Dkt. 108, ¶30.] One such account was Commonwealth Edison ("ComEd"), represented by Bruce Mahoney ("Mahoney"). [*Id.*] The parties dispute whether Mahoney complained about Hoffberg not meeting ComEd's expectations. At his deposition, Turner testified that during one meeting with Mahoney and Hoffberg, Mahoney spoke privately with Turner about his frustrations with FMP's time management on a ComEd project. [*Id.*, ¶31.] Turner testified that Mahoney did not "personally call out [Hoffberg's] work and performance" but that it was "more as an FMP situation." [Dkts. 91 at 151 (Tr. 54:17−55:13); *see also* 113, ¶18.] Mahoney told Turner that ComEd's managers "would not be as forgiving" as him. [Dkt. 108, ¶31.] Hoffberg disputes this and points to Mahoney's declaration where he stated that "*at no time* did I ever criticize or complain to Mr. Turner about Mr. Hoffberg's customer service or job performance . . . . In my experience, Mr. Hoffberg was responsive to the needs of [ComEd], and consistently demonstrated high quality customer service." [Dkt. 97-3 at 2 (emphasis in original).]

As another example, in December 2019, Hoffberg failed to place a group lunch order for the ComEd team during a ComEd visit to FMP, which resulted in ComEd paying for its own meal. [Dkt. 108, ¶32.] On a different occasion, Hoffberg did not

---

[3]     FMP experienced a decline in business and underwent a reorganization that included two rounds of layoffs—one in February 2019 and a second in August 2019. [Dkt. 108, ¶¶26, 28.] During this process, Turner, under FMP's directive, terminated seven sales representatives aged 33 to 54. [*Id.*] Hoffberg was not included in these terminations. [*Id.*, ¶¶27, 29.]

remove old inventory for ComEd, which resulted in Turner having to help Hoffberg with completing this task. [*Id.*, ¶33.]

Hoffberg was also assigned to the National Express client account. [Dkt. 113, ¶18.] The parties dispute whether Hoffberg was removed from this client account following complaints from National Express. FMP asserts that National Express threatened to stop doing business with FMP if Hoffberg remained as the assigned sales representative. [Dkt. 108, ¶34.] FMP maintains that it could not afford to lose National Express as a client, so Turner removed Hoffberg from the account in 2019. [*Id.*] Hoffberg disputes this. He testified that his assignment to the National Express account was only temporary, and that he responded to the client's needs in a timely manner. [Dkts. 91 at 82 (Tr. 93:13−95:12); 113, ¶18.]

A key meeting between Hoffberg, Turner, and Borgardt occurred on January 15, 2020. [Dkt. 108, ¶35.] FMP characterizes the meeting as one intended to discuss Hoffberg's performance and failure to meet job expectations, his future job expectations, and how FMP could assist Hoffberg in improving his performance. [*Id.*, ¶35.] Hoffberg disputes this characterization, claiming that the meeting was an "account review meeting that every salesperson has with the regional sales manager," to review accounts and increase business. [Dkt. 91 at 94 (Tr. 143:9−15).]

During the meeting, FMP maintains that Hoffberg's age arose within the context of Hoffberg's "previous, repeated assertions" that he wanted to retire. [Dkt. 108, ¶36.] Hoffberg remembers things differently. He asserts that he did not talk to anyone at FMP about retiring and that Turner raised the topic of Hoffberg's

5

retirement and his age. [*Id.*; Dkt. 91 at 95 (Tr. 145:2–24).] According to Hoffberg, during the meeting, Turner incorrectly stated that Hoffberg was 69 years old and asked retirement-related questions such as, "How much longer are you planning on working?" "Are you going to retire?" and "Can you afford to retire?" [Dkt. 91 at 94 (Tr. 143:16–22); *id.* at 101 (Tr. 170:12–16).] Hoffberg says he responded by telling Turner, "I don't think you can ask me those questions," to which Turner responded, "that's only if I was hiring you. You are already hired, I can ask you anything I want." [Dkt. 91 at 91 (Tr. 143:16–24).] Hoffberg replied, "I don't think so, and if you want to get Barb Stapleton [from human resources] on the phone, we could verify that." [*Id.* at 95 (Tr. 144:1–2).] According to Hoffberg, Turner became "very angry" and said, "All right, I'll drop it." [*Id.* (Tr. 144:2–4).] FMP does not dispute that Turner made comments about Hoffberg's age and inquired about his retirement plans. At his deposition, Turner testified that he asked Hoffberg how old he was "in reference to . . . how long he had planned to do what he's doing," and that he wanted to "call him out like, Dennis [Hoffberg], we want to finish strong here. Our time is now. I'm of the same age." [*Id.* at 143 (Tr. 22:20–23:8); Dkt. 113, ¶23.]

At his deposition, Hoffberg acknowledged that following the meeting, he did not raise any concerns with anyone at FMP about Turner's remarks, including Human Resources. [Dkts. 108, ¶37; 91 at 94 (Tr. 146:15–22).] Hoffberg also admits that he has no knowledge of any improper age-related remarks by FMP management before January 2020. [Dkt. 108, ¶38.]

Two months after the meeting, on March 9, 2020, Turner and Borgardt issued Hoffberg a written warning (the "Second Corrective Action") because his performance had not improved since the January meeting. [*Id.*, ¶¶39–40; Dkt. 91 at 274−275.] Hoffberg disputes that his performance had not improved, pointing to Borgardt's deposition testimony that Hoffberg made "some improvements on communication." [Dkt. 91 at 210 (Tr. 36:21−37:24).] At his deposition, Hoffberg testified that he disagreed with the issues raised in the Second Corrective Action, [*Id.* at 83 (Tr. 97:4−98:22)], but he "agreed with all the actions" proposed in the Second Corrective Action. [*Id.* (Tr. 99:3–6); Dkt. 108, ¶40.] Hoffberg did not raise any concerns or discuss the Second Corrective Action with anyone at FMP, including human resources.[4] [Dkts. 108, ¶40; 91 at 83—84.] The following day, on March 10, 2020, Hoffberg received his 2019 annual performance review, which was prepared and signed by Borgardt with some input from Turner. [Dkt. 113, ¶16.] Borgardt rated Hoffberg as "below expectations." [*Id.*; Dkt. 97-8.]

Hoffberg contends that, as of March 18, 2020, he was projected to generate more than $4 million in 2020 sales, which was nearly one million dollars more than his actual 2019 sales results, and that his "year-to-date gross profit percentage was [ ] 3.4% higher than his 2019 gross profit percentage." [Dkts. 113, ¶28.] FMP, on the other hand, disputes this as a mischaracterization of the sales figures. [*Id.*] FMP also maintains that Hoffberg did not improve after the Second Corrective Action. [Dkt. 108, ¶41.] Hoffberg disputes this, and in support, points to Turner's deposition

---

[4] Except for complaining about his compensation in 2018, Hoffberg testified that he never raised any complaints with FMP's human resources. [Dkt. 108, ¶53.]

testimony when Turner said he was unsure whether Hoffberg improved because he was "solely focused on COVID," Hoffberg was at home because of "a high-risk situation," and FMP's customers "were closed, so there was no opportunity to make a call." [Dkt. 91 at 156 (Tr. 73:13−74:4).]

## B. Hoffberg's Termination from FMP

Due to the impact of the Coronavirus-19 pandemic, FMP underwent "major changes" in its regular business operations to adapt to the economic challenges caused by the pandemic. [Dkt. 108, ¶42.] Specifically, FMP faced "massive closures" of some of its locations; its customers could not accept deliveries, which created a "halt" in FMP's business; and it had to hold weekly meetings about payroll. [*Id.*]

Responding to the economic impact, FMP's leadership mandated organizational adjustments and personnel cuts, aiming to cut a million dollars from the payroll in the Chicago region. [*Id.*, ¶43.] Acting on this directive, Turner instructed operations managers, including Borgardt, to provide him with a list of employees to be considered for termination based on job performance. [*Id.*, ¶44.] The job performance criteria included factors such as access to customers, availability to serve the customers, past work performance, budget numbers pertaining to the customers, follow-through with the day-to-day tasks, sales results, and day-to-day business operations. [*Id.*, ¶45.]

Borgardt submitted a list of three sales representatives to Turner: Hoffberg and two younger sales associates, Moises Santiago ("Santiago") and Jorge Prado ("Prado"). [*Id.*, ¶46; Dkt. 113, ¶6.] FMP maintains that Hoffberg was on the list because he was lower-performing than his peers, he "struggled to drive business,"

8

and his 2019 performance review indicated that he was performing below expectations. [Dkt. 108, ¶¶47−48.] Santiago and Prado also received similar performance reviews. [*Id.*, ¶49.]

Upon receiving the lists of names, Turner forwarded them to FMP's Headquarters for review, and FMP decided to terminate Hoffberg. [*Id.*, ¶50.] On April 3, 2020, Turner called Hoffberg to inform him that FMP was terminating him based on the negative business impact of COVID; Hoffberg responded by saying "he knew this was coming." [*Id.*] Hoffberg disputes whether Turner provided any explanation as to the reason for the firing. [*Id.*]

Within FMP's Great Lakes region, 26 employees,[5] including Hoffberg, were either terminated or furloughed because of the effects of COVID on the business. [*Id.*, ¶52.] FMP terminated Hoffberg, while Santiago and Prado, the two younger Chicago sales representatives on the list, were furloughed. [Dkt. 113, ¶6.] Approximately one year later, FMP rehired Prado and Santiago—in June and July 2021, respectively. [*Id.*]

The parties dispute the degree to which Turner played a role in Hoffberg's termination. Turner testified that he had a "very limited role," [*see id.*, ¶14], but Hoffberg points to FMP's Equal Employment Opportunity Commission ("EEOC") Position Statement, which states that Turner was tasked with "making such difficult

---

[5]    A FMP termination list contains the names of 18 FMP employees in the Chicago and Great Lakes Region, along with the reason for termination. [Dkt. 98.] The list states that Hoffberg was terminated because of "Coronavirus 2020," and that Prado and Santiago were terminated because of "Lack of Work/Staff Reduction." [*Id.*]

decisions and determined that it was necessary to end Mr. Hoffberg's employment relationship on April 3, 2020." [Dkts. 97-2 at 7–8; *see* 113, ¶14.]

After Hoffberg's termination, Matt Francis ("Francis") took over Hoffberg's accounts, followed by Chris Dodge ("Dodge"), and later Stephanie Chemers ("Chemers"). [Dkt. 113, ¶7.] Francis, Dodge, and Chemers are each younger than Hoffberg. [*Id.*]⁶ On August 7, 2020, Hoffberg filed a Charge of Discrimination against FMP with the EEOC, alleging age discrimination and retaliation. [Dkt. 108, ¶¶5, 54.]

### C.    Hoffberg's Employment and Termination from MarketSource

After his termination from FMP, Hoffberg obtained employment with LeMay Auto Parts and later MSX International. [*Id.*, ¶55.] In May 2022, after filing this lawsuit, Hoffberg was hired as an account sales manager at MarketSource, an automotive supply company that does business with FMP. [*Id.*, ¶56; Dkt. 113, ¶¶29–30.] Hoffberg advised John Mulawa ("Mulawa"), a hiring manager at MarketSource, about his "legal issues with FMP." [Dkt. 113, ¶31.] While the parties dispute some of the details, all agree that Hoffberg assured Mulawa that he "would be able to work, interact, and communicate with FMP and FMP personnel," and that "FMP would be one of his regular accounts." [Dkt . 108, ¶59.]

In July 2022, two months after Hoffberg joined MarketSource, Francis Buckley ("Buckley"), General Counsel for MarketSource, Ashley Gilligan ("Gilligan"), Associate General Counsel for MarketSource, and Mulawa had a conference call with

---

⁶    Hoffberg asserts that Francis, Dodge, and Chemers are at least 10 years younger than him. [Dkt. 113, ¶7.] The record does not support this assertion. Although FMP responded that the Francis, Dodge, and Chemers were "younger" than Hoffberg, the citation provided by Hoffberg does not state their individual ages or the exact age differences. [Dkt. 113, ¶7.]

FMP's then-General Counsel, Sherry Stenerson ("Stenerson") and Todd Heldt ("Heldt"), an FMP employee. [*See* Dkts. 108, ¶¶60−64; 113, ¶¶36−37; 97-6 at 9 (Tr. 22:13−23:24).] During the call, Heldt requested that Hoffberg not be assigned to FMP's account temporarily and that MarketSource refrain from sharing FMP's sales data with Hoffberg while the litigation was pending. [Dkts. 108, ¶60; 113, ¶37.] Mulawa testified that no one at FMP asked, requested, or demanded that MarketSource terminate Hoffberg. [Dkt. 108, ¶60.] Buckley testified that no one at FMP suggested that FMP would cease doing business with MarketSource if Hoffberg remained in this role. [*Id.*, ¶64.] Hoffberg testified that he has no independent knowledge about the communications between FMP and MarketSource, and that he has no facts showing that FMP discussed his pending litigation or made negative comments about him to MarketSource. [*Id.,* ¶67.]

On July 22, 2022, MarketSource terminated Hoffberg. [*Id.*, ¶61.] According to Mulawa, Hoffberg was terminated because he was unable to perform his job duties on the FMP account. [*Id.*] Hoffberg does not dispute that this was the reason for his termination from MarketSource, but he does dispute whether he was able to perform his job duties. [*Id.*] Hoffberg filed a second EEOC charge against FMP in January 2023, alleging post-termination retaliation by FMP based on his termination from MarketSource. [*Id.*, ¶66.]

In his amended complaint, Hoffberg raises three ADEA claims for age discrimination (Count I), retaliation (Count II), and post-termination retaliation (Count III). [Dkt. 58.]

## II.    Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted).

## III.    Analysis

## A.    Count I: Age Discrimination

The Court first considers Hoffberg's age discrimination claim under the ADEA. The statute protects workers 40 years and older from age-based employment discrimination. 29 U.S.C. § 623(a)(1). The ADEA provides that it is unlawful for an employer to "discharge . . . or [ ] discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." *Id.* § 623(a)(1). Hoffberg will survive summary judgment if "the evidence would permit a reasonable factfinder to conclude that [his age] caused the discharge or other adverse employment action." *Brooks v. Avancez*, 39 F.4th 424, 433 (7th Cir. 2022) (citation omitted). However, "in the ADEA context, it's not enough to show that age was a motivating factor. The plaintiff must prove that, but for his age,

the adverse action would not have occurred." *Martino v. MCI Commc'ns Serv., Inc.*, 574 F.3d 447, 455 (7th Cir. 2009).

An ADEA plaintiff may either "prove discrimination in a holistic fashion," under *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) or rely on the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework, which gives the plaintiff the initial burden to establish a *prima facie* case of discrimination, after which "'the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual.'" *Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020) (citation omitted). Under either approach, the Court asks whether, looking at the record as a whole, "a reasonable jury could conclude that the plaintiff suffered the adverse employment action because of his membership in a protected class." *See Ortiz*, 834 F.3d at 764–65. Hoffberg's brief does not engage with *McDonnell Douglas'* framework or its requirements, so the Court's analysis proceeds under *Ortiz*'s holistic method.[7] [*See* Dkt. 107.]

Under the holistic approach, the Court must ask "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [age] caused the

---

[7]    Hoffberg waived his *McDonnell Douglas* argument by failing to develop it. *Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 704 (7th Cir. 2022) ("Seventh Circuit precedent is clear that perfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived." (cleaned up)). He does not articulate a *prima facie* case of discrimination, argue that he was meeting FMP's legitimate job expectations, or discuss why Prado and Santiago are "directly comparable to him in all material respects." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (cleaned up). This is waiver.

discharge." *Ortiz*, 834 F.3d at 765 (applying *Ortiz* to ADEA claims); *Lewis v. Indiana Wesleyan University*, 36 F.4th 755, 760 (7th Cir. 2022) (the court assesses the evidence as a whole, rather than asking whether any particular piece of evidence proves the case by itself). In making this determination, "all evidence belongs in a single pile and must be evaluated as a whole." *Ortiz*, 834 F.3d at 766; *see also Senske v. Sybase*, 588 F.3d 501, 507 (7th Cir. 2009) ("At the end of the day, the question is simply whether 'the same events would have transpired' if [Plaintiff] 'had been younger than 40 and everything else had been the same.'" (quoting *Gehring v. Case Corp.*, 43 F.3d 340, 344 (7th Cir. 1994))).

A plaintiff may demonstrate causation through evidence of comments or animus toward his protected group, suspicious timing, more favorable treatment of similarly situated employees, or pretextual reasons given for the termination. *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017); *see also Joll v. Valparaiso Community Schools*, 953 F.3d 923, 929 (7th Cir. 2020) (there are "three broad types of circumstantial evidence that will support an inference of intentional discrimination: ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment.") If, taken together, this "evidence would permit a reasonable jury to infer an overall likelihood of discrimination," summary judgment must be denied. *Id.*

Drawing all reasonable inferences in Hoffberg's favor, a reasonable jury could conclude that FMP's stated reasons for terminating Hoffberg—personnel cuts

associated with the COVID-19 pandemic—amount to pretext. Pretext "requires more than showing that the decision was mistaken, ill-considered or foolish, and so long as the employer honestly believes those reasons, pretext has not been shown." *Formella v. Brennan*, 817 F.3d 503, 513 (7th Cir. 2016) (citation omitted). Hoffberg can "demonstrate pretext directly by showing that 'a discriminatory reason more likely motivated' his termination, or indirectly by showing that [the employer's] explanations are 'unworthy of credence.'" *Senske v. Sybase*, 588 F.3d 501, 507 (7th Cir. 2009) (citation omitted). In determining whether an employer's explanation is honest, courts look to the reasonableness, not the accuracy, of the explanation. *Duncan v. Fleetwood Motor Homes of Ind., Inc.*, 518 F.3d 486, 492 (7th Cir. 2008); *see also Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered."). A plaintiff cannot survive summary judgment merely by raising a dispute as to the accuracy of the reasoning behind an adverse employment action—there must be evidence from which a jury could conclude that the employer acted with an illegal discriminatory motive. *See Brooks*, 39 F.4th at 435−36 ("Because courts are not super-personnel departments who sit in judgment of management decisions, it is of no moment if the employer's reasoning is incorrect, 'foolish, trivial or even baseless.'") (citation omitted)).

It is true, as FMP argues, that a company-wide reduction in workforce due to an economic downturn can be a legitimate, non-discriminatory reason for a plaintiff's termination. *See, e.g., Ritter v. Hill 'N Dale Farm, Inc.*, 231 F.3d 1039, 1043–44 (7th

Cir. 2000) (finding that an economic downturn in [the] defendant's industry was a legitimate, non-discriminatory reason for a reduction in force); *Schuster v. Lucent Techs.*, Inc., 327 F.3d 569, 574 (7th Cir. 2003) (observing that a business's need to reduce costs was a legitimate, non-discriminatory reason for a reduction in force). When an employer's stated reason for the discharge is a reduction in force, a plaintiff may show pretext by demonstrating that the employer "did not honestly believe that a [reduction in force] was the reason she was fired and that age tipped the balance in favor of her discharge." *Paluck v. Gooding*, 221 F.3d 1003, 1012 (7th Cir. 2000).

Here, FMP asserts that it changed its business operations to adapt to the economic challenges caused by the pandemic, which included cutting one million dollars from payroll in the Chicago Region. [Dkt. 108, ¶¶42−43.] After receiving names of employees to be considered for termination based on job performance and other factors, FMP terminated or furloughed 26 employees from the Chicago and Great Lakes Region. [*Id.*, ¶¶50, 52.] Hoffberg, however, has come forth with sufficient evidence from which a finder of fact might reasonably conclude that "the specific reasons given for including [him] in the reduction were pretextual," even if the personnel cuts were otherwise bona fide. *Paluck*, 221 F.3d at 1013.

First, as Hoffberg argues, he was the only employee in the Chicago Region who was actually terminated. [Dkt. 107 at 9, 12.] The other impacted employees discussed by the parties—Santiago and Prado—were younger than Hoffberg and both were furloughed and later re-hired, a fact that FMP does not dispute. [Dkts. 107 at 8–10; 108, ¶49; 113, ¶6.] Hoffberg asserts that he was 68 at the time of his firing and that

he was among the oldest sales representative in FMP's Chicago Region, (*see* Dkt. 91 at 207 (Tr. 23:12–24)), also a fact that FMP does not expressly dispute. [Dkt. 113, ¶1.] Hoffberg asserts that his job duties were absorbed or re-assigned to substantially younger employees who were not terminated, which is not disputed. [Dkts. 113, ¶7; 107 at 14.]

Second, as circumstantial evidence of discriminatory animus, Hoffberg points to "age and retirement related statements" by Turner, who played a role in the decision to terminate Hoffberg.[8] [Dkt. 107 at 10–11.] There is no dispute that at the January 15, 2020 meeting, Turner discussed Hoffberg's age and asked him questions about his retirement plans. [*See* Dkts. 107 at 8–10; 108, ¶36; 91 at 94, 101, 143.] According to FMP, Turner's comments were nothing more than an ordinary and lawful inquiry into Hoffberg's plans for retirement, and that an isolated instance such as this one is generally insufficient to show a discriminatory motive. [Dkt. 112 at 6 (citing *Colosi v. Electri-Flex Co.*, 965 F.2d 500, 502 (7th Cir. 1992) ("Indeed, "a company has a legitimate interest in learning its employees' plans for the future, and it would be absurd to deter such inquiries by treating them as evidence of unlawful conduct."").] But viewed in a light most favorable to Hoffberg, a reasonable fact finder might conclude that Turner did more than merely ask whether Hoffberg had plans to retire. At his deposition, Turner testified that he asked Hoffberg how old he was "in reference to . . . how long he had planned to do what he's doing," and Turner wished

---

[8] As noted above, the parties dispute the degree to which Turner was involved in the decision to terminate Hoffberg. Because there is some record evidence to support the conclusion that Turner was among the relevant decisionmakers, [*see* Dkts. 113, ¶14; 97-2 at 7–8], the Court includes Turner as a decisionmaker for purposes of a causation analysis.

to "call him out like, Dennis [Hoffberg], we want to finish strong here. Our time is now. . . ." [Dkt. 91 at 143 (Tr. 22:20–23:8).] A reasonable reading of these remarks at least contributes to the inference that age animus may have caused the termination.

It is true that the passage of time between the comments and the termination weakens the animus inference. *See Schuster*, 327 F.3d at 574 ("the less direct the connection between the comment and the employment action—that is, if the comment was not made in temporal proximity to the employment action, or if the comment was not made in reference to that action—the less evidentiary value the comment will have."). But considering the role Turner played in the decision to terminate Hoffberg, the remarks also support the conclusion that unlawful animus was the cause of the termination. *See Joll*, 953 F.3d at 935 ("A remark or action by a decision-maker reflecting unlawful animus may be evidence of his or her attitudes more generally."); *Patterson v. Triangle Tool Corp.*, 2016 WL 3519617, at *5 (E.D. Wis. June 22, 2016) (statements by the decision-maker, including that "the time for [plaintiff] to retire had come," were not mere inquiries into retirement plans for staffing purposes; a jury could reasonably infer that plaintiff was selected for a layoff because the decision-maker thought plaintiff was old enough to retire).

Lastly, Hoffberg's overall positive performance evaluations under Tom Cinnamon as compared to his negative performance evaluation shortly after the January 2020 meeting, arguably support an inference that FMP used Hoffberg's performance as pretext for discrimination. Less than two months after the January 2020 meeting, Hoffberg received the Second Corrective Action, and the next day, he

18

received his 2019 performance evaluation, which had been prepared by Borgardt with Turner's feedback. [Dkt. 91 at 216 (Borgardt testifying that when he completed Hoffberg's 2019 evaluation, he received feedback from Turner "because [Hoffberg] reported to [Turner] just as much as he reported to me.").] That performance evaluation rated Hoffberg as performing "below expectations," but prior performance evaluations in 2016, 2017 and 2018 under Cinnamon rated him as "meeting expectations." [Dkts. 113, ¶ 1; 107 at 4, 9.] Ordinarily, the Court's inquiry focuses on an employee's conduct at the time he was terminated, *see Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014), but recently the Seventh Circuit has considered earlier performance history under similar circumstances. *Vichio v. U.S. Foods, Inc.*, 88 F.4th 687, 692 (7th Cir. 2023) (plaintiff's earlier performance ratings were relevant to whether employer used performance as pretext for discrimination because plaintiff received his first negative performance review from a new supervisor who exhibited some age-based animus).

Here, there is at least some disputed evidence in the record about whether Hoffberg's performance improved after the Second Corrective Action and whether the reasons for FMP being dissatisfied with Hoffberg's 2019 performance is "[ ]worthy of credence." *Senske*, 588 F.3d at 507; *see also Vichio,* 88 F.4th at 692. FMP says that Hoffberg's performance did not improve following the Second Corrective Action, [Dkt. 108, ¶41], but Hoffberg disputes this, citing to Turner's testimony and to what Hoffberg characterizes as an inaccurate description of Mahoney's feedback about Hoffberg's performance and customer complaints from Com-Ed. [Dkts. 91 at 156 (Tr.

73:13−74:4) (Turner testifying that he was unsure whether Hoffberg's performance improved because he was solely focused on the pandemic, Hoffberg was out due to a health-related situation, and FMP's customers were closed); *id.* at 274−275; 97-3 at 2.] He also cites to FMP projected sales figures as of March 2020 that, according to Hoffberg, show that he was projected to generate substantially more in sales in 2020 than his actual sales results in 2019. FMP does not dispute this. [Dkts. 107 at 6; 113, ¶28.]

In sum, there is evidence in the record that could lead a reasonable jury to conclude that Hofberg's performance was lacking, and that his poor performance appropriately led to his inclusion on the list for termination. A reasonable factfinder could also conclude that Turner's remarks about Hoffberg's age may or may not have been a *motivating* factor, but that age was not the *but-for* cause of the termination. Hoffberg, on the other hand, has presented sufficient evidence from which a reasonable fact finder might instead find that the specific reasons given for including him in the reduction were pretextual. Because "summary judgment is appropriate only if no reasonable factfinder could conclude" that Hoffberg was targeted for termination due to his age, and because material factual disputes remain, Hoffberg's age discrimination claim must proceed to trial and summary judgment is denied as to Count I. *Vichio*, 88 F.4th at 695.

## B.    Count II: Age Retaliation

Count II raises an ADEA retaliation claim. The ADEA prohibits an employer from retaliating against an employee who has engaged in statutorily protected activity. *See* 29 U.S.C. § 623(d). A plaintiff can establish a *prima facie* case of

20

retaliation under the direct or indirect method. *Durkin v. City of Chicago*, 341 F.3d 606, 614 (7th Cir. 2003) (citation omitted). Hoffberg frames his claim using the direct method, so to survive summary judgment, he must produce sufficient evidence for a reasonable jury to conclude that: (1) he engaged in statutorily protected activity; (2) FMP took materially adverse action against him; and (3) there is a but-for causal connection between the two. *Skiba v. Ill. Cent. R.R.*, 884 F.3d 708, 718 (7th Cir. 2018) (citing *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017)); *Barton v. Zimmer, Inc.*, 662 F.3d 448, 455 (7th Cir. 2011); *see also Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 678-79 (7th Cir. 2005) (applying same standard to Title VII and ADEA retaliation claims). "As with discrimination claims, the question for a retaliation claim should always be: 'Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge?'" *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 959 (7th Cir. 2021) (quoting *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016)); *Ortiz*, 834 F.3d at 765.

A plaintiff must "engage in statutorily protected activity before an employer can retaliate against [him] for engaging in statutorily protected activity." *Durkin*, 341 F.3d at 614−15. Internal complaints to an employer can constitute protected activity. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663–64 (7th Cir. 2006); *see Lang v. Illinois Dep't of Child. & Fam. Servs.*, 361 F.3d 416, 419 (7th Cir. 2004). But for a complaint to qualify as "statutorily protected activity," it "must be about the [challenged] discrimination." *McHale v. McDonough*, 41 F.4th 866, 871 (7th Cir.

2022). "In order for [a plaintiff's] complaints to constitute protected activity, they must include an objection to discrimination on the basis of age." *Smith v. Lafayette Bank & Tr. Co.*, 674 F.3d 655, 658 (7th Cir. 2012). While "an employee need not use . . . magic words," like "age," *see Sitar v. Indiana Dept. of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003), "[m]erely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Tomanovich*, 457 F.3d at 663.

On this record, no reasonable juror could conclude that Hoffberg engaged in a statutorily protected activity following the January 2020 meeting. Hoffberg concedes that he never raised any concerns about Turner's remarks during the January 2020 meeting with anyone at FMP, including Human Resources. [Dkt. 108, ¶37; Dkt. 91 at 94 (Tr. 146:15—22).] In his brief, Hoffberg maintains only that during the meeting with Turner, he "offered to contact FMP's Director of Human Resources to discuss the situation." [*See* Dkt. 107 at 3.] But he cites no authority for the proposition that "offering" to raise an objection to the discrimination is sufficient evidence from which a jury could find that he engaged in a statutorily protected activity. Simply put, there is no evidence from which a reasonable fact finder could conclude that Hoffberg ever made FMP aware that he believed he was facing age-based discrimination. *See Skiba*, 884 F.3d at 718-19; *Tomanovich*, 457 F.3d at 663. And because he did not report a violation, he was not retaliated against. *Bolden v. Veritiv Pub. & Print Mgt., Inc.*, 2021 WL 11421350, at \*4 (N.D. Ill. Mar. 23, 2021); *Miller v. Am. Fam. Mut. Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000) ("An employee can honestly believe [he] is the

object of discrimination, but if [he] never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints.")

No reasonable juror could conclude that Hoffberg engaged in protected activity that resulted in retaliation. Because Hoffberg has not met his burden,[9] summary judgment on Count II is appropriate.

## C. Count III: Post-Termination Age Retaliation

Finally, Count III raises a post-termination retaliation claim. "'[F]ormer employees, in so far as they are complaining of retaliation that impinges on their future employment prospects or otherwise has a nexus to employment, do have the right to sue their former employers.'" *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 642 (7th Cir. 2004) (quoting *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 891 (7th Cir. 1996)). To survive summary judgment, Hoffberg must produce evidence of the same three retaliation elements discussed above. *Skiba*, 884 F.3d at 718 (citing *Baines*, 863 F.3d at 661).

On the first element, the parties do not dispute that Hoffberg's August 2020 EEOC charge qualifies as protected activity, as does Hoffberg's lawsuit against FMP. *Smith*, 674 F.3d at 658; 29 U.S.C. § 623(d) (litigation under the ADEA is a protected activity).

---

[9]    Hoffberg's response brief makes a passing reference to suspicious timing in a subheading, but he does not otherwise develop or discuss evidence of causation as it relates to Count II. Because he has waived any causation argument, his retaliation claim also fails for this reason. *Rock Hemp Corp.*, 51 F.4th at 704 ("Seventh Circuit precedent is clear that perfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived." (cleaned up)).

As to the second element, FMP argues that Hoffberg cannot show that it took a materially adverse action against him. [*See* Dkt. 92 at 13−14.] Specifically, it argues that there is no evidence establishing, for instance, that FMP: (1) prevented Hoffberg from seeking, obtaining, or keeping future employment; (2) disseminated information intended to prevent Hoffberg from obtaining employment; or (3) furnished false information, negative references, or publicized Hoffberg's EEOC charges or lawsuit against FMP. [*Id.* at 14.]

It is impossible to create a "precise list of activities that constitute adverse employment actions." *Atanus v. Perry*, 520 F.3d 662, 677 (7th Cir. 2008). Instead, whether an act is materially adverse will "often depend on the particular circumstances," and "[c]ontext matters." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006). A materially adverse action for a retaliation claim "must be severe enough to dissuade a reasonable employee from exercising statutory rights." *Barton*, 662 F.3d at 456.

Hoffberg's response on this score is difficult to follow. He maintains that "the long, contentious history of this litigation" "created significant animosity between the parties and provided FMP with retaliatory motivation." [Dkt. 107 at 14−15.] In the Court's view, this argument is insufficient to create a genuine issue of material fact as to Count III.

Drawing all reasonable inferences in his favor, Hoffberg has not come forth with sufficient evidence that FMP took materially adverse action against him as it relates to his employment with MarketSource, or that any potential adverse action

has a but-for causal connection to his termination from MarketSource. Hoffberg admits that he has "no independent knowledge or facts regarding the alleged communications between FMP and MarketSource," and that he has "no facts to support his claim that FMP discussed his pending litigation or made negative comments about Hoffberg to MarketSource." [Dkt. 108, ¶ 67.] He admits that he informed MarketSource of his lawsuit against FMP in connection with the offer of employment, and that Hoffberg assured Mulawa that he "would be able to work, interact, and communicate with FMP and FMP personnel." [Dkt. 108 ¶¶58–59.] MarketSource's General Counsel testified that FMP never asked or directed MarketSource to terminate Hoffberg, nor did anyone at FMP have any involvement in the decision (*see* Dkt. 91 at 335 (Tr. 54:13–22); *id.* at 326 ("The decision to terminate Mr. Hoffberg involved individuals at MarketSource only and did not involve any FMP employees")); Hoffberg does not dispute this. [Dkt. 108, ¶63.] Hoffberg admits that while FMP's former General Counsel requested that Hoffberg not work on the FMP account, "neither she nor anyone at FMP suggested that FMP would cease doing business with MarketSource if Hoffberg remained in his role." [*Id.*, ¶64.] At best, he speculates that the contentious nature of the litigation gave FMP motivation to retaliate. But speculation as to FMP's motivation is not enough to survive summary judgment. *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 936 (7th Cir. 2021) (noting that a "party must present more than mere speculation or conjecture to defeat a summary judgment motion."). Accordingly, the Court grants summary judgment in favor of FMP on Count III, Hoffberg's post-termination retaliation claim.

## IV.  Conclusion

For the reasons stated above, FMP's motion is granted in part and denied in part.

[Dkt. 90.] Summary judgment on Hoffberg's age discrimination claim, Count I, is

denied. The motion is granted as to Hoffberg's retaliation claims, Counts II and III.

Enter: 21-cv-5063
Date:  January 23, 2024

_____
Lindsay C. Jenkins
United States District Judge